2002 ME 164

**Walter E. TAGGART**

v.

**James E. TAGGART et al.**[1]

Supreme Judicial Court of Maine.

Argued: Sept. 9, 2002.

Decided: Nov. 5, 2002.

Graydon G. Stevens (orally), Kelly, Remmel & Zimmerman, Portland, for plaintiff.

Peter J. DeTroy (orally), Christopher C. Taintor, Paul F. Driscoll, Norman, Hanson & DeTroy, L.L.C., Portland, for defendants.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

ALEXANDER, J.

[¶ 1] Walter Taggart appeals from a judgment of the Superior Court (Sagadahoc County, *Atwood, J.*) finding for James and Mildred Taggart (the Taggarts) in an

1. Mildred Taggart, Joseph A. Miara. Jr., Trustee of the Miara Family Trust, and And- over Bank are also named defendants in this action.

action for specific performance for purchase of land owned by the Taggarts, in which Walter, the Taggarts's son, had a purchase option. Walter asserts that the Superior Court erred when it found that he had breached his agreement with the Taggarts by failing to (1) obtain loan approval within 30 days of the effective date of the agreement, as required in paragraph 16 of the purchaser's agreement, or (2) notify the Taggarts that he would pay cash for the property. Walter contends that he was not in default of the agreement because (1) his failure to meet the financing deadline was merely a waiver of a deadline intended for his benefit, and (2) in order for him to be placed in default, the Taggarts were required to first offer a deed free of encumbrances. We affirm the Superior Court's judgment.

## I. CASE HISTORY

[¶ 2] In 1980, the Taggarts purchased lots 23 and 25 on Fosters Point Road in West Bath. Walter Taggart then purchased lot 23 from his parents. At the same time, Walter and the Taggarts entered into a reciprocal agreement that gave both parties the rights of first and last refusal in each other's property. The right of first and last refusal agreement included a requirement that, once a third-party offer is received and communicated, the party with the right of refusal would have 15 days to accept or reject the offer on the same terms and conditions as the third-party offer.

[¶ 3] On April 2, 1998, the Taggarts signed a purchase and sale agreement with Joseph Miara for lot 25. By letter of April 3, the Taggarts notified Walter of the Miara agreement to begin a preliminary 30-day negotiation period specified in the 1980 agreement.[2] Walter acknowledged receipt of this letter on April 7.

[¶ 4] The notice to trigger the running of the 15-day accept or reject period was sent on May 5, 1998. In the May 5 letter, the Taggarts stated that, if Walter took advantage of his right of first refusal, the Taggarts were willing to extend the closing date, then May 21, 1998, to the earliest date sufficient to allow Walter to benefit from the various financing, title and inspection time periods in the Miara agreement. Walter responded in a May 18 letter, informing the Taggarts that Walter intended to exercise his right of first refusal to purchase lot 25.

[¶ 5] Walter applied to First Federal Bank for financing within the 7-day period required by the purchase and sale agreement. On May 28, the Taggarts mailed Walter a letter that: (1) named an attorney who could arrange a clean title insurance commitment for lot 25; (2) stated that any failure to use the attorney's services would be considered a breach of a duty of good faith; (3) indicated that a 30-day period to obtain loan approval would end on June 18, 1998. The letter also warned that, if Walter unjustifiably failed to close on June 19, the Taggarts would consider him in breach of the 1980 agreement, and the Taggarts would proceed with the sale of their residence to Miara in accordance with their agreement. Finally, the letter indicated that Walter had until June 19 to purchase lot 25 for cash.

[¶ 6] Walter objected to a June 19 closing date. Walter stated that, even if he received loan approval from a bank, mere approval would not guarantee that funds

---

**2.** Communication between the Taggarts and Walter was conducted almost exclusively through their respective attorneys. Accordingly, references to communications between the Taggarts and Walter involve communications between attorneys unless the context indicates otherwise.

would be available on June 19 for closing. Walter also questioned whether lot 25 was of sufficient size to meet the Town's three-acre minimum lot size requirement.

[¶ 7] The Taggarts responded on June 4, stating that they would extend the closing date if Walter obtained a financing commitment within the required time period and, again, stating that Walter could pay cash for the property until June 19.

[¶ 8] Walter responded on June 12, raising certain title and land use issues, such as easements across lot 25 and the minimum lot size requirement, that were unsatisfactory. Walter stated that he believed these defects to be violations of the purchase and sale agreement and that the agreement allowed for the closing date to be moved back so that these defects could be remedied.

[¶ 9] The Taggarts replied on June 17, stating that raising title issues did not excuse Walter's obligations under the purchase and sale agreement. The following day, First Federal Bank denied Walter's application for financing, including in its denial a notation regarding the existence of an underground storage tank. Notice of the denial was faxed to the Taggarts.

[¶ 10] Before the June 19 closing date, Walter did not contact the Taggarts to inform them that he was able and willing to pay cash for the property. The parties had no further communications before the Taggarts closed the sale with Miara on July 1, 1998. After determining that lot 25 had been transferred to Miara, Walter brought this action for specific performance. At trial, Walter testified that he had looked into alternative sources of financing and could borrow $500,000 from a personal source. However, there was no evidence that this information was ever communicated to the Taggarts.

[¶ 11] The Superior Court found that Walter had failed to prove his claim for specific performance. Specifically, the court determined that Walter's right of first refusal was effective on May 19, 1998. Therefore, pursuant to the Miara purchase and sale agreement, Walter was required to (1) notify the Taggarts within 7 days that he had applied for financing or he would be deemed in default of the agreement, and (2) obtain financing approval within 30 days. The court concluded that Walter had failed to adhere to the provisions of the Miara agreement, which resulted in his breaching his option to purchase, excusing the Taggart's performance. This appeal followed.

## II. DISCUSSION

■ [¶ 12] The relevant portion of paragraph 16 of the Miara agreement, which was a focus of the Superior Court's consideration, provides that:

> [w]ithin seven days from the effective date hereof, Buyer shall supply Sellers with a letter from a qualified lender stating that Buyer has made application for such financing or Buyer shall be considered in default. This Purchase and Sale Agreement is also subject to Buyer obtaining loan approval within 30 days of the effective date hereof.

The Superior Court reasoned that Walter was in breach by failing to obtain financing within 30 days because the clause regarding default pertaining to the 7–day financing application deadline also applied to the portion of the agreement concerning the 30–day loan approval deadline.

[¶ 13] Walter cites *Williams v. Ubaldo*, 670 A.2d 913, 916 (Me.1996), and *Ross v. Eichman*, 129 N.H. 477, 529 A.2d 941, 943–44 (1987), in support of his argument that the financing deadline was primarily for his benefit. He argues that, by not complying with the 30–day deadline, he was

merely waiving the protections offered by the clause and, therefore, he was not in default. *Williams* is distinguishable from the instant case because *Williams* concerned financing terms, not a financing or closing deadline. *See* 670 A.2d at 915. Financing terms that benefit the buyer refer to those terms such as a maximum interest rate, points, or length of the mortgage contract. By contrast, a financing deadline gives the seller a date by which the seller will know whether the buyer is able to perform.

■ [¶ 14] The primary beneficiary of a mortgage financing deadline in a real estate sales contract is the seller. *See Churgin v. Hobbie,* 39 Mass.App.Ct. 302, 655 N.E.2d 1280, 1283 (1995) (holding that the seller was not obligated to return the buyer's deposit because the buyer failed to communicate his intent to take advantage of the protections of the financing term contingency and because the seller was protected by the financing deadline contingency).

[¶ 15] Walter's argument is not supported by *Ross v. Eichman. Ross* held that the buyers, who did not obtain bank financing pursuant to a contract, but who informed the sellers that they would close on the set date with cash, were entitled to specific performance of the sale because the buyers could elect to waive the protection of the financing contingency. 529 A.2d at 943–44. In *Ross,* the buyers notified the sellers that they would attend the closing with sufficient cash to complete the transaction. *Id.* at 943. Walter, on the other hand, never informed the Taggarts of his intention or ability to pay cash for the property. Also, he failed to communicate with the Taggarts after informing them that his bank financing was denied.

[¶ 16] Walter contends that the Taggarts were required to either perform or offer to perform by presenting a deed free of en-cumbrances before he could be declared in default. He relies on *Pelletier v. Dwyer,* 334 A.2d 867, 870–71 (Me.1975), to support his claim that both he and the Taggarts had concurrent duties under the agreement and that the Taggarts needed to perform or to offer to perform before they could demand performance from Walter. He argues that, because the Taggarts failed to tender to him a deed conveying the property free of unsatisfactory easements and in conformity with the town's zoning ordinances, they could not demand payment from him. *Pelletier* is distinguishable from the facts here. In *Pelletier,* we held that Dwyer, who did not provide sufficient proof of his readiness and willingness to perform, was not entitled to retain Pelletier's deposit because the contract between the parties was such that it created concurrent duties of performance. *Id.* As the party seeking to enforce performance, Dwyer was obligated to perform or to offer to perform before he could demand performance of Pelletier. *Id.*

■ [¶ 17] The reasonableness of a tender of performance is a question of fact. *Id.* at 871. In the instant case, Walter had approximately 10 weeks from the original April 3 notice of the contract with Miara to arrange financing or indicate his readiness to purchase the property for cash. The Taggarts communicated their readiness and willingness to perform on several occasions, including their May 28 and June 4 letters, indicating they would address any title and land use issues and convey a good and marketable title to Walter. The evidence in the record certainly does not compel a conclusion that the Taggarts were unwilling to perform.

■ [¶ 18] The law does not permit a purchaser to fail to perform his obligations to obtain financing or offer to pay cash by a set date, and then to successfully bring

 

an action for specific performance, alleging land use law compliance defects as an excuse for nonperformance.

[¶ 19] In *Thompson v. Skowhegan Savings Bank*, 433 A.2d 434, 437 (Me.1981), we stated that:

[a]s a general rule, the vendee, under an executory contract for the sale of land, cannot complain of defects in the vendor's title before the time set for delivery of the deed. The rule follows from the fact that the vendor cannot be said to have breached his agreement to convey marketable title until he fails to deliver a deed to land with a title clear of all encumbrances but those specified in the agreement.

However, the vendee may have an anticipatory remedy by way of *rescission* of the contract

if defects or encumbrances of title are of such a character that the vendor has neither the title which he has agreed to convey nor in a practical sense any prospect of acquiring it-that is, if the vendor probably or presumably will not have the agreed title at the time set for the conveyance, the defects or encumbrances being probably or presumably not removable . . . .

(internal citations omitted).

[¶ 20] The Taggarts' attorney testified that he could have removed any encumbrances unsatisfactory to Walter quickly, because the Taggarts were in control of both the dominant and servient estates. The Taggarts were also prepared to convey a lot that conformed to the minimum lot size ordinance by either obtaining an estoppel letter from the town or increasing the lot size to three acres by adding land from lot 24A, which they owned. Accord-

ingly, the Superior Court did not err in finding that Walter had failed to prove his claim for specific performance and that Walter breached the Miara agreement by (1) not obtaining a financing commitment within the 30–day deadline, and (2) not notifying the Taggarts of his intention to pay cash for the property by June 19.

The entry is:

Judgment affirmed.