STATE OF MAINE
YORK, ss

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-13-010

STATE OF MAINE
Cumberland, ss, Clerk's Office

DEC 2 4 2015

RECEIVED

SUZANNE LUKAS
and MARK LUKAS,

Plaintiffs

v.                                                      JUDGMENT

GERALDINE OLLILA-
PICKUS, M.D.,

Defendant

## Background

Jury-waived trial on plaintiffs' complaint and defendant's counterclaim was held on September 3-4, 2015. Proposed findings of fact and conclusions of law were filed September 18, 2015.

In their complaint, plaintiffs allege breach of contract (failure to purchase property), breach of contract (failure to forfeit earnest money), and negligent misrepresentation.¹ In her counterclaim, defendant alleges breach of contract (failure to release earnest money).

## Facts

Plaintiffs built their home at 6 Shore Road in Biddeford, Maine in 2006-2007. In May 2012, plaintiff Mark Lukas was employed as an investigator for the Department of Health and Human Services. Plaintiff Suzanne Lukas was Superintendent of Schools in Buxton and, later, Ellsworth. Their children were no longer living in the family home. In order to keep their options open, plaintiffs listed the property for sale in March 2010 for $1,250,000.00.

---

¹ Plaintiffs' request for specific performance was withdrawn.

1

Plaintiffs believed the prime selling season for the area was May through mid-September. According to Ginny Whitney, a real estate broker from Sotheby's with 29.5 years of experience in the business, the prime selling season for York County is spring and summer. Plaintiffs' first agent, Peter McPeters, listed the property for one year beginning April 1, 2011 but the property did not sell. Plaintiffs next listed the property with Ms. Whitney, who represented plaintiffs in their dealings with defendant.

Ms. Whitney believed plaintiffs' property was difficult to price because of the absence of comparables. Based on three offers of $750,000.00, $810,000.00, and $850,000.00, Ms. Whitney believed plaintiffs' price could not be supported. (Def.'s Ex. 14.)

Defendant is a physician and works at the Maine Center for Healthcare and the Cosmetic Enhancement Center. In the spring of 2012, defendant and her husband, Owen Pickus, a physician and an attorney, decided to separate and defendant agreed to move from the home they occupied with their two children. Defendant was not listed on the deed or mortgage for that home. They agreed defendant would find a new residence during the separation. Plaintiffs' property was .4 miles from Owen Pickus's home. The location and the fact the house was one the children would want to visit were favorable factors for defendant.

Owen Pickus participated in viewing plaintiffs' property with defendant. He reviewed the Purchase and Sale Agreement and advised defendant to sign it. The down payment was to consist of defendant's selling stock and a contribution from Owen Pickus. The Pickuses had significant assets.

Real estate broker Marc Fishman represented defendant in the sale. He was aware she and her husband were in the process of separating but thought the situation was as amicable as a separation could be.

2

On May 1, 2012, Mr. Fishman sent an offer on plaintiffs' property to Ms. Whitney. He stated the buyer "is qualified and pre-approved for the loan." (Pls.' Ex. 2.) Although plaintiffs were pleased with the preapproval, Heidi Maynard, a real estate broker with 23 years of experience and owner of Pack Maynard, stated that a preapproval letter does not mean a buyer will obtain financing.

The Purchase and Sale Agreement was prepared by both brokers and was effective May 5, 2012. (Jt. Ex. 1.) Among the provisions in the Agreement are the following:

1.      PURCHASE PRICE:  For such Deed and conveyance Buyer agrees to pay the total purchase price of $890,000.00. Buyer will deliver to the Agency within 3 days of the Offer Date, a deposit of earnest money in the amount $5,000.00.  If said deposit is to be delivered after the submission of this offer and is not delivered by the above deadline, this offer shall be void and any attempted acceptance of this offer in reliance on the deposit being delivered will not result in a binding contract.  Buyer agrees that an additional deposit of earnest money in the amount of $35,000.00 will be delivered within 10 days of acceptance.  Failure by Buyer to deliver this additional deposit in compliance with the above terms shall constitute a default under this Agreement.  The remainder of the purchase price shall be paid by wire, certified, cashier's or trust account check upon delivery of the Deed. (Jt. Ex. 1 ¶ 5.)

2.      TITLE AND CLOSING:   A deed, conveying good and merchantable title . . . shall be delivered to Buyer and this transaction shall be closed and Buyer shall pay the balance due and execute all necessary papers on June 13, 2012 (closing date) or before, if agreed in writing by both parties.   If Seller is unable to convey in accordance with the provisions of this paragraph, then Seller shall have a reasonable time period, not to exceed 30 calendar days, from the time Seller is notified of the defect, unless otherwise agreed to in writing by both Buyer and Seller, to remedy the title.  Seller hereby agrees to make a good-faith effort to cure any title defect during such period.  If, at the later of the closing date set forth above or the expiration of such reasonable time period, Seller is unable to remedy the title, Buyer may close and accept the deed with the title defect or this Agreement shall become null and void in which case the parties shall be relieved of any further obligations hereunder and any earnest money shall be returned to the Buyer. (Jt. Ex. 1 ¶ 7.)

3.      FINANCING:   (a) This Agreement is subject to Financing.   If subject to Financing:  This Agreement is subject to Buyer obtaining a conventional loan of 70.000% of the purchase price, at an interest rate not

3

to exceed prevailing % and amortized over a period of 30 years. Buyer is under a good faith obligation to seek and obtain financing on these terms.

(b) Buyer to provide Seller with letter from lender showing that Buyer has made application for loan specified in (a) and, subject to verification of information, is qualified for the loan requested within 5 days from the Effective Date of the Agreement. If Buyer fails to provide Seller with such letter within said time period, Seller may terminate this Agreement and the earnest money shall be returned to Buyer.

(c) Buyer hereby authorizes, instructs and directs its lender to communicate the status of the Buyer's loan application to Seller, Seller's licensee or Buyer's licensee.

(d) After (b) is met, Buyer is obligated to notify Seller in writing if a lender notifies Buyer that it is unable or unwilling to provide said financing. Any failure by Buyer to notify Seller within two days of receipt by Buyer of such notice from a lender shall be a default under this Agreement. (Jt. Ex. 1 ¶¶ 14(a)-(d).)

4.    DEFAULT/RETURN OF EARNEST MONEY: In the event of default by the Buyer, Seller may employ all legal and equitable remedies, including without limitation, termination of this Agreement and forfeiture by Buyer of the earnest money. In the event of a default by Seller, Buyer may employ all legal and equitable remedies, including without limitation, termination of this Agreement and return to Buyer of the earnest money. Agency acting as escrow agent has the option to require written releases from both parties prior to disbursing the earnest money to either Buyer or Seller. (Jt. Ex. 1 ¶ 16.)

Based on the agreed purchase price of $890,000.00, plaintiffs understood the 30% down payment would be $267,000.00. Plaintiffs believed the higher down payment bode well for the mortgage to be approved and they would not have accepted a 10% down payment. The sale price and the 30% down payment led plaintiffs and their broker to believe they had received "a good, strong offer."

The parties signed the Agreement effective May 5, 2012 for the sale of plaintiffs' property. (Jt. Ex. 1.) Defendant understood her obligations under paragraph 14 of the Agreement. Mr. Fishman referred defendant to Donald Murdoch, a home mortgage consultant at Wells Fargo, who began the loan application process. Mr. Fishman had worked with Mr. Murdoch for many years. Mr. Murdoch was the only representative

4

from Wells Fargo Mr. Fishman communicated with. Mr. Fishman was not sure which loan product defendant decided to apply for.

After execution of the Agreement, defendant deposited $5,000.00 in escrow. (Jt. Ex. 1 ¶ 5.) The additional $35,000.00 of earnest money was received late, which upset plaintiff Mark Lukas.

During the loan application process, Mr. Murdoch is Wells Fargo's primary contact with a customer such as defendant. It was his obligation to inform the customer if information was needed or conditions had to be met.

Although defendant understood she had a good faith obligation to apply for 70% financing with a 30% down payment, she applied to one lender only, Wells Fargo, and applied for 80-20 financing. Defendant applied for the loan herself with no co-borrower. Mr. Murdoch discussed her options and it made more sense for her to pay less money for the down payment.

Defendant did not inform the person who made the welcome call on May 23, 2012 that defendant was going through a divorce but stated that Mr. Fishman and Mr. Murdoch knew about the divorce from the beginning. Defendant was prequalified for the loan, which was then sent to underwriting at Wells Fargo. At the time, Wells Fargo had a backlog of three months on loan applications. Mr. Murdoch was not certain when the condition on the loan "came through." While a loan was in suspense, Wells Fargo could not provide a loan.

The Wells Fargo underwriters were located in Ohio and Mr. Murdoch communicated with them through assistants. The loan notes were sent to the assistants and Mr. Murdoch. Communication between Mr. Murdoch and the underwriters was through email or loan notes. (See, e.g., Pls.' Ex. 21 390.) The underwriting assistants were not prompt in communicating loan conditions.

5

Plaintiffs received a letter from the lender dated May 9, 2012 that stated defendant had applied for a loan, a standard requirement in a purchase and sale agreement. (Pls.' Ex. 3; Jt. Ex. 1 ¶ 14(b).) The letter does not, however, comply with paragraph 14(b) of the Agreement, which requires "Buyer to provide Seller with letter from lender showing that Buyer has made application for loan specified in (a) . . . ." (Jt. Ex. 1 ¶ 14(b).) The Agreement further provides, "If Buyer fails to provide Seller with such letter within said time period, Seller may terminate this Agreement and the earnest money shall be returned to Buyer." (Jt. Ex. 1 ¶ 14(b).)

Plaintiffs and Ms. Whitney testified that they had no reason to doubt that defendant applied for the loan specified in the Agreement. Plaintiffs did not terminate the Agreement. (Jt. Ex. 1 ¶ 14(b).) Unless notified of a change, according to Ms. Whitney, standard practice allows the assumption that the specified loan was sought. The letter provides that defendant "has made application for the property" and the "application is subject to final verification and re-verification of all information concerning the qualifications of the applicant and the property according to the Jumbo Non-Conforming guidelines." (Pls.' Ex. 3; see Jt. Ex. 1 ¶ 14(b).) Ms. Whitney was not sure whether the jumbo guidelines applied to a conventional loan. Ms. Maynard said that would depend on the bank because the banks "are all over the place." Ms. Maynard stated further that when she receives a letter from a lender stating that a potential buyer has sought financing, she sends the purchase and sale agreement to the lender so it knows what is in the agreement. If something changes from the purchase and sale agreement, the buyer's agent should create an addendum and have it signed. There is no evidence Ms. Maynard's practice was pursued in this case.

Pursuant to the Agreement, after the letter requirement was complied with, "Buyer is obligated to notify Seller in writing if a lender notifies Buyer that it is unable

6

or unwilling to provide said financing. Any failure by Buyer to notify Seller within two days of receipt by Buyer of such notice from a lender shall be a default under this Agreement." (Jt. Ex. 1 ¶ 14(d).)

On May 18, 2012, defendant requested more time to research radon issues. (Pls.' Ex. 4.) Plaintiffs agreed. (Jt. Ex. 2.) Based on an elevated radon test, defendant wanted a radon mitigation system installed. Plaintiffs would have preferred to give defendant a credit at the closing but ultimately installed the system on June 20, 2012 at a cost of $1,150.00. (Pls.' Ex. 7.)

The original closing date was scheduled for June 13, 2012. (Jt. Ex. 1 ¶ 7.) That date could not be met because of a title issue and because the Wells Fargo underwriters were backed up on loan applications. Mr. Murdoch did not say the date could not be met because Wells Fargo would not give defendant financing.

On May 31, 2012, Mr. Fishman emailed Ms. Whitney and requested an extension of the closing date because of the Wells Fargo back up. (Pls.' Ex. 7 3.) He provided Mr. Murdoch's contact information to confirm that information. Mr. Fishman stated in the email to Ms. Whitney, "Please have the seller sign the closing extension so I can provide it to the lender for them to proceed with the underwriting as they stated they will not be ready to close by June 13th." (Pls.' Ex. 7 7.)

Plaintiffs inquired about the delays. Ms. Whitney responded that she was told the volume of mortgages was more than Wells Fargo could process and the underwriters at Wells Fargo were swamped. If Mr. Fishman had known of other barriers to the loan, he would have told Ms. Whitney. According to Mr. Fishman, defendant did not inform him the loan application was suspended due to conditions, either before or after the May 18, 2012 email was sent. (Pls.' Ex. 4.)

7

After signing the Agreement and before the June 13, 2012 closing, defendant most likely knew that she would not be able to meet Well Fargo's standards. (Jt. Ex. 6 42.) Before the mid-June closing date, defendant knew that her husband was not going to help her with the down payment. He had previously agreed the down payment would come from his account but he declined to help after hiring an attorney. Owen Pickus would not provide the gift letter requested by Wells Fargo. (Def.'s Ex. 30 434.)

Sometime in June 2012, defendant tried to sell jewelry in Boston to obtain money for the down payment. Mr. Pickus took the jewelry to Boston but instructed the jeweler not to sell the jewelry until the divorce was completed. The jeweler did not communicate this to defendant. She also had retirement funds but accessing these funds required time and a substantial penalty for withdrawal.

Mr. Fishman sent an email to defendant on June 18 and inquired about the status of the divorce. Defendant did not know how long the divorce process would take but expected she would need an extension of the closing date. (Pls.' Ex. 11.) As far as Mr. Fishman knew, the separation was amicable, defendant was optimistic, and she would be able to purchase the house. He was not aware of the divorce decree requirement from Wells Fargo but learned of the requirement on June 25, 2012 from Mr. Murdoch.

The closing date was extended to June 28, 2012. (Pls.' Ex. 7 5; Jt. Ex. 3.) The appraisal was accepted by the lender and defendant waived the appraisal contingency. (Pls.' Ex. 7 7.) Because plaintiffs were required to give possession of the property to defendant at the closing and because defendant had the right to view the property within 24 hours prior to closing, plaintiffs had to schedule movers well ahead of the closing date. (Jt. Ex. 1 ¶ 9.) The Boston closing agent/attorney was available June 22 and Ms. Whitney requested scheduling the closing for that day at 4:00 p.m. (Pls.' Ex. 10 2.) Ms. Lukas relied on the June 22 closing date because of her busy work schedule and

8

because plaintiffs had moved their personal property from their home on June 21, 2012. She was upset when the closing did not take place.

Plaintiffs were not told at this time that defendant had sought financing other than that specified in the Agreement or that defendant could not obtain that financing. Ms. Whitney advised plaintiffs that they had to have a "certain amount of faith" that the sale would happen and proceed accordingly. Plaintiffs moved all of their belongings and rented a house in Prospect Harbor. Ms. Lukas had accepted a job as Superintendent of Schools in Hancock and Washington Counties.

The closing did not take place on June 22. Plaintiffs learned on June 20, 2012 that it would not take place. (Def.'s Ex. 16.) At this point, plaintiffs were concerned but agreed to extend the closing date to June 28. The parties executed an extension. (Jt. Ex. 3.) Plaintiffs still had no understanding of defendant's efforts to obtain financing. (Jt. Ex. 1 ¶ 14(c).) During her representation of plaintiffs, Ms. Whitney was never told defendant applied for a loan other than the specified 70-30 loan or that Wells Fargo wanted a copy of the divorce decree.

By email to Ms. Whitney dated June 25, 2012, Mr. Fishman requested an extension of one month based on the "remaining loan condition." (Pls.' Ex. 12.) Mr. Fishman explained why the closing could not take place on June 28. He first learned of the requirement of a divorce decree on June 25, 2012. (Def.'s Ex. 11.) Ms. Whitney was also communicating with Mr. Murdoch. Mr. Fishman did not have a letter from the lender. (Jt. Ex. 7 21.) Mr. Fishman conveyed he was not clear to close and asked for an extension to allow defendant to meet the conditions. According to Mr. Fisman, on June 25 he was crystal clear with Ms. Whitney that defendant could not close, which is why he asked for an extension. Defendant knew the June 28, 2012 closing would not happen

9

by that date. Mr. Fishman forwarded the request for the extension to Attorney Orso and stated the extension had not yet been accepted. (Pls.' Ex. 14.)

Ms. Whitney believed the requested one-month extension was "ridiculous." According to Ms. Whitney, this email was her first notice that there was an outstanding loan condition as opposed to delay from the lender, which she considered very different issues. When Ms. Whitney represents a buyer who cannot obtain financing, she requests documentation from the lender that it will not approve the loan in order to exercise the financing contingency. Ms. Whitney did not consider Mr. Fishman's June 25, 2012 email as exercising the financing contingency. (Pls.' Ex. 12; Jt. Ex. 1 ¶ 14(d).) Mr. Fishman also proposed defendant lease the property until the loan went through, a proposal plaintiffs did not accept. (Def.'s Ex. 11.) Realtors recommend not renting a property when trying to sell it.

After the June 25, 2012 email and before June 28, 2012, Ms. Whitney contacted Mr. Murdoch about the loan condition. He stated the condition "was of a personal nature." (Def.'s Ex. 26.) No one from Wells Fargo said it was unwilling to approve the loan but only that there was a condition on the loan.

If she had known the specifics about defendant's efforts to obtain the loan at the time of the first closing extension, Ms. Whitney stated she would either have advised plaintiffs not to agree to the extension or would have sought a "kick-out provision" to continue to market the property and notify the buyer to act immediately if another offer was received. Such a provision may have made the property more attractive to Mary Wilmont, who made a back-up offer. (Pls.' Ex. 22.)

Defendant told Mr. Fishman that although she was doing everything she could do, it would be very hard to meet Wells Fargo's conditions. She was not able to produce a letter from her husband regarding the down payment and she was not able to provide

a divorce decree. (Jt. Ex. 6 37.) Mr. Fishman then spoke with Mr. Murdoch. Defendant continued her efforts through June because she very much wanted to purchase the property. She needed more time to work out the differences with Mr. Pickus in order to obtain the down payment. Defendant did not tell Mr. Fishman she could not come up with the down payment until, perhaps, at the very end when an extension was requested. Ultimately defendant knew she was not able to obtain either a $178,000.00 or $267,000.00 down payment by June 28, 2012. In defendant's view, the only real condition to be met was the down payment.

Plaintiffs did not agree to the one-month extension. Plaintiffs and Ms. Whitney were not happy. (Def.'s Ex. 9.) Defendant proposed a lease purchase option with a security deposit to be applied to the down payment and monthly payments of $3,000.00. (Def.'s Exs. 11, 25.) Attorney Taylor sent an email dated June 27, 2012 to Mr. Fishman stating plaintiffs were ready to close on June 28, 2012 and outlining what plaintiffs would consider in an effort to negotiate an extension to July 6, 2012. (Pls.' Ex. 16.) Mr. Fishman recommended to defendant that she hire an attorney. Plaintiffs received no response from Mr. Fishman or defendant to the counteroffer. The attorneys for the parties exchanged letters. (Pls.' Exs. 18, 19.) Plaintiffs alleged defendant had defaulted and exercised no contingencies. (Pls.' Ex. 18.) Defendant alleged she had not breached the Agreement and invoked the mediation clause. (Pls.' Ex. 19; Jt. Ex. 1 ¶ 17.) The parties stipulated at trial that they attended mediation but did not resolve their dispute.

Mr. Fishman denied he had communicated that the financing contingency had been met, as suggested by Attorney Taylor. (Pls.' Ex. 16.) On June 27, 2012, Mr. Fishman told defendant and Attorney Orso the escrow money was at risk because, Mr. Fishman testified, he "was trying to be safe." (Pls.' Ex. 17.) Mr. Fishman believed

11

defendant continued to have the right to exercise the contingency. He believed his detailed email stating that defendant was not clear to close could be the writing required by the Agreement. (Jt. Ex. 1 ¶ 14(d).) Once the attorneys became involved, a few days before the closing, Mr. Fishman was asked to cease communication.

The record contains a series of email communications contained in Wells Fargo loan notes that were subpoenaed by plaintiffs. (Pls.' Ex. 21.) The loan notes dated May 23, 2012 from Marlene Raymond, an underwriting assistant with Wells Fargo, provide that Ms. Raymond requested "proof of divorce proceedings." (Pls.' Ex. 21 387.) On the same day, Mr. Murdoch sent an email to Ms. Raymond, "Divorce info. I will get for you. It just started so I can get you what Gerry is expecting to receive." (Pls.' Ex. 21 388.) The loan notes from Lisa Rogg, an underwriter, dated May 24, 2012 provide that defendant was to provide a copy of the divorce decree. (Pls.' Ex. 21 395.) On May 30, 2012, Mr. Murdoch sent an email to Mr. Fishman about information that was needed, including a copy of the separation agreement and the status of the divorce proceedings. (Def.'s Ex. 7.) On May 30, 2012, defendant responded and Mr. Murdoch forwarded the response to underwriting. (Pls.' Ex. 21 443.) Defendant stated her divorce was not final. (Pls.' Ex. 21 443.) Mr. Murdoch understood the divorce proceedings were ongoing. During May 2012, no one asked defendant for a copy of a divorce decree.

Also on May 30, 2012, the loan notes from Ms. Raymond provide that she discussed the suspended items with defendant, who requested that Ms. Raymond send an email outlining what was needed from defendant. (Pls.' Ex. 21 386.) The notes also reflect defendant would supply "proof of funds to close after 6/1/12." (Pls.' Ex. 21 386.) Defendant recalled she spoke with Ms. Raymond on May 30, 2012. They discussed the suspense conditions, including a gift letter. Defendant wrote the letter, which was reviewed by her husband, and then sent to Wells Fargo. She had many

12

communications regarding the status of the settlement agreement or divorce proceedings. (See, e.g., Pls.' Ex. 5.) There was no requirement of producing a divorce decree. Defendant responded to Mr. Murdoch's request for information regarding the divorce proceedings. (Pls.' Ex. 6.) Although she stated the "divorce is not final," the divorce proceeding was not begun until July 2012. Defendant was unaware of the required wait period after the filing of a divorce complaint. Defendant's representation of the divorce settlement did eventually occur but the process took much longer than she had anticipated.

On June 4, 2012, Ms. Raymond sent an email to defendant and requested, among other things, a gift letter from defendant if her husband intended to contribute toward the property price. (Pls.' Ex. 21 434.) Ms. Raymond stated defendant's employment had been verified. (Pls.' Ex. 21 434.) Ms. Raymond did not request a copy of the divorce decree. (Pls.' Ex. 21 434.) Ms. Raymond's loan note dated June 4, 2012 reflects the information requested. (Pls.' Ex. 21 385.) The note reflects that after defendant sends a gift letter and information from Bank of America and Citi Mortgage, "then I can send the suspended conditions to the underwriter." (Pls.' Ex. 21 434.)

Mr. Murdoch could not remember when the divorce decree became an issue. On June 13, 2012, Ms. Rogg sent an email to Ms. Raymond and Mr. Murdoch and outlined the conditions for the loan, including receiving a copy of the divorce decree. (See Pls.' Ex. 21 426.) On June 19, 2012, Wells Fargo was interested in receiving a copy of defendant's divorce decree or separation agreement, what defendant was expecting to receive in the divorce, retirement funds information, and copies of bank/asset statements. (Pls.' Ex. 21 383, 386-88, 395, 406, 426, 434, 491; see also Pls.' Exs. 5, 6.) These requests from Wells Fargo were not communicated to plaintiffs.

13

The loan notes dated June 19, 2012 provide that Ms. Raymond emailed defendant and requested a copy of the divorce decree and the other three items identified in Ms. Rogg's June 13 email. (Pls.' Ex. 21 383.) That email to defendant is not in evidence. Defendant denied receiving any email requesting a divorce decree or that the divorce decree issue was raised by Wells Fargo. (Cf. Jt. Ex. 6 35-37.) She agreed Wells Fargo requested divorce information and a great deal of other information. (Pls.' Ex. 21 388; Pls.' Ex. 5; Def.'s Ex. 5.)

On July 20, 2012, a Wells Fargo Regional Processing Manager was concerned about the need to cancel the loan because it had been suspended since May 24, 2012. (Pls.' Ex. 21 407, 403.) The loan was cancelled on August 15, 2012. (Pls.' Ex. 21 403.)

Defendant did not purchase plaintiffs' property. The property was not relisted immediately because of an offer from Mary Wilmont. Plaintiffs and Ms. Wilmont entered a Purchase and Sale Agreement for the property effective July 30, 2012 for $875,000.00. (Def.'s Ex. 24.) Ms. Wilmont was relieved of her obligation based on inspection issues and did not purchase the property.

Plaintiffs relisted the property in April 2013 for $1,100,000.00 with Ms. Maynard. She marketed the property in Downeast, Maine Home and Design, newspapers, on the Internet, her web site, and Facebook, and had nine open houses. The sale price was reduced three times: to $989,000.00 on June 14, 2013; to $949,000.00 on August 12, 2013; and to $899,000.00 on August 23, 2014.

Although plaintiffs' son lived in the home for a period of time, the house was generally empty, a red flag to potential buyers according to Ms. Whitney. Potential buyers wonder why a property was under a contract that fell through and believe they can get a better deal. A fully furnished home makes people want to move in. Plaintiffs

14

and Ms. Maynard recreated the dining room and living room, which potential buyers first saw when they entered the home.

The property finally sold to Paul and Barbara McConnell. (Pls.' Ex. 23.) They closed on January 12, 2014. The sale price was $850,000.00, which Ms. Maynard believed was the fair market value.

Plaintiffs claim damages of $163,948.49 as a result of defendant's failure to purchase the property. (Pls.' Ex. 26; see Pls.' Exs. 23, 27-37.) Plaintiffs seek amounts incurred between June 28, 2012, the date of the failed closing, and January 13, 2014, the date of the sale to the McConnells. Claimed damages include mortgage interest, real estate taxes, insurance, heating and electric, snow plowing, association dues, lawn care, costs for staging, and moving costs, all of which total $83,948.49. In addition, plaintiffs seek to retain the escrow deposit of $40,000.00 and the difference between defendant's contract price and the McConnell sale price, $40,000.00. Finally, plaintiffs request attorney's fees.

Ms. Whitney agreed that conditions placed on a loan is common and does not mean the lender was unwilling or unable to provide the loan. Further, when she is a buyer's agent and knows of conditions, she does not necessarily advise the seller's agent of the conditions. Pursuant to the realtors' code of ethics, however, notice is required for any significant loan condition. (Pls.' Ex. 47 Art. 2.) Ms. Whitney concluded that a condition of the loan that cannot be met by the closing date means the buyer is unable to obtain the loan. If a buyer is unable to obtain financing, she would get a statement from the lender stating that it is unable to approve the loan, which is not difficult to do, according to Ms. Whitney.

Mr. Fishman stated some conditions are more significant than others. The requirement of a divorce decree is a significant condition, according to Mr. Fishman,

15

especially because defendant and her husband were only separated and not going through a divorce. If he learned of a significant condition from the lender that imposed a major barrier to financing, he would exercise the financing contingency.

When Ms. Maynard represents a buyer who has difficulty obtaining a loan, she stays in contact with the lender. She states it is pivotal for the broker to stay in touch with the lender in order to know where they are in the process and what must be done. She obtains a letter from the lender on its letterhead and notifies the listing agent for the property that there are issues with financing. If the specified timeframes are met, the deposit is returned to the buyer. She states there is a good faith obligation to notify the other party of problems.

Mr. Fishman stated that if he learns of significant loan conditions from a client or lender that impose major barriers, he would not be required to give those details to the other party but would just exercise the contingency. He agreed that brokers do get along and share information.

It was Ms. Whitney's expert opinion that plaintiffs did all they were required to do under the Agreement but defendant did not meet her obligations because she did not apply for the 70-30 loan and did not inform plaintiffs of that fact. Pursuant to the Agreement, Ms. Whitney concluded defendant forfeited the earnest money. (Jt. Ex. 1 ¶ 16.)

Mr. Fishman believed defendant absolutely acted in good faith in her effort to obtain a loan. She was very upset because she had her heart set on buying plaintiffs' house.

At the close of the evidence, the parties stipulated to the following:

1. Owen Pickus, defendant's ex-husband, promised to defendant he would provide funds for the down payment on the property;

16

2. Mr. Pickus refused to provide a gift letter for the down payment funds;

3. Mr. Pickus delivered defendant's jewelry to a jeweler in Boston and asked that the jewelry not be sold; and

4. As of May 30, 2012, Mr. Pickus and defendant were discussing a verbal agreement and defendant's May 30, 2012 letter to Mr. Murdoch reflected what they had discussed.

Conclusions

A. Plaintiffs' Complaint

The plaintiffs' theory of this case appears to be that defendant is a person who acts in bad faith and who intentionally misleads others or does not tell the truth. The court's assessment is different. Unquestionably, defendant wanted to purchase plaintiffs' property because she wanted to reside near her children when they were with Owen Pickus and she believed the children would want to stay at the home with her because it was a lovely home. She responded to the many requests for information during the loan application process while in the midst of a difficult divorce. She pursued every avenue to obtain the down payment after her husband changed his mind about his commitment to contribute to the down payment after he hired a divorce attorney.

The court concludes that Wells Fargo did not ask defendant for a copy of her divorce decree until June 25, 2012, days before the June 28, 2012 closing. During her loan application process, defendant complied with Wells Fargo's requests for information, including the details about her divorce settlement. Defendant requested that Wells Fargo send an email with further requested information. (Pls.' Ex. 21 386.) Although Wells Fargo noted the email was sent, it was not produced in response to plaintiffs' subpoena and is not in evidence. (Pls.' Ex. 21 383.) Defendant testified,

17

credibly, that she never saw that email. Further, as defendant testified at trial, why would she go through this entire process if she required a divorce decree that could not be provided but its unavailability could easily be explained?

Finally, there is no question that Wells Fargo was unable to process loan applications in a timely way. Mr. Murdoch agreed that the backlog existed and informed Mr. Fishman of that fact. Mr. Murdoch further stated that the Wells Fargo underwriters were not prompt in communicating with him. The facts that on May 23, 2012, Mr. Murdoch told Ms. Raymond that the divorce had just started and on May 24, 2012, Ms. Rogg requested a copy of the divorce decree reflect that Wells Fargo was not communicating appropriately.

### 1. Breach of Contract

Plaintiffs allege defendant breached the parties' Agreement by failing to purchase the property and by failing to forfeit the earnest money. They argue defendant (1) waived the financing contingency when she applied for an 80-20 loan, (2) failed to give proper notice regarding the contingency, and (3) waived her right to exercise the contingency when the June 13, 2012 financing deadline passed and was not extended. First, as discussed below, defendant did not waive the financing contingency by applying for an 80-20 loan.

Second, the June 13, 2012 deadline was extended precisely because Wells Fargo was not ready to close by June 13, 2012. (Pls.' Ex. 7 7.) The argument that only the closing date was extended to June 28, 2012 and the financing deadline remained at June 13, 2012 is not supported by the record.

Third, defendant did not exercise the financing contingency because she was never notified by Wells Fargo that it was unable or unwilling to provide financing. (Jt. Ex. 1 ¶ 14(d).) Wells Fargo did not cancel the loan application until August 15, 2015.

18

Mr. Murdoch agreed that Wells Fargo did not say it would not provide financing. Instead, Wells Fargo informed defendant of the requirement of a divorce decree just before the June 28, 2012 closing. When Mr. Fishman and defendant learned of this requirement, they requested a one-month extension. Plaintiffs declined.

Mr. Fishman, in his email of June 25, 2012, made clear defendant was not clear to close but was not exercising the financing condition. He requested a one-month extension because defendant could not close and proposed alternative methods for defendant to acquire plaintiffs' home. He hoped to resolve the remaining loan condition. (Pls.' Ex. 12.) No letter from Wells Fargo regarding financing was given to plaintiffs or Ms. Whitney.

In order to prevail on the two contract claims, plaintiffs must prove (1) breach of a material contract term; (2) causation; and (3) damages. See Me. Energy Recovery Co. v. United Steel Structures, Inc., 1999 ME 31, ¶ 7, 724 A.2d 1248.

Assuming that defendant's failure to apply for 70-30 financing was a breach of a material contract term, that breach proximately caused no damage. There is nothing in this record that suggests Wells Fargo would have approved a 70-30 loan application and not an 80-20 application. The lender was satisfied with defendant's income. The requirement of a divorce decree, an impossibility for defendant, stalled the financing.

A financing or closing deadline provides a date by which seller knows whether buyer is able to perform. See Taggart v. Taggart, 2002 ME 164, ¶ 13, 809 A.2d 1229. Defendant was unable to perform because she did not have the necessary down payment and could not provide a divorce decree because she was not divorced.

According to Ms. Maynard, the Agreement in this case is "standard." The agreement identifies two events of default: buyer's failure to deliver the additional earnest money and buyer's failure to notify seller of a lender's notice that it is unable or

19

unwilling to provide financing. (Jt. Ex. 1 ¶¶ 5, 14(d); see Jt. Ex. 1 ¶ 16.) If the seller is unable to provide a deed conveying good and merchantable title by the closing date, the agreement may become null and void and the earnest money is returned to the buyer. (Jt. Ex. 1 ¶ 7.) The Agreement is silent with regard to any consequence of buyer's failure to pay the balance due by the closing date. Further, the Agreement discusses "a default by seller" but the Agreement identifies no event of default by a seller. (Jt. Ex. 1 ¶ 16.)

"[W]hether time is of the essence in a contract is a matter of fact[.]" Raisin Mem'l Trust v. Casey, 2008 ME 63, ¶ 21, 945 A.2d 1211. The absence or presence of "time is of the essence" language is not dispositive and courts consider the "nature, circumstances, and purpose of the contract to determine whether time is of the essence." Id.; see W.G. Ambrose Enters. v. Keefe, 2009 Me. Super. LEXIS 136, at *7 (Sept. 23, 2009) (plaintiff entitled to strict performance, despite absence of time of the essence language, because agreement specified that payments were due on the first of each month). Although not expressly stated, the parties' Agreement makes clear time was of the essence. The closing date was specified and could be extended only by agreement of the parties. Further, if plaintiffs could not deliver good title within the identified timeframe, the Agreement "shall become null and void" unless the buyer accepts the deed with a title defect. (Jt. Ex. 1 ¶ 7); see Frost v. Barrett, 246 A.2d 198, 201 (Me. 1968) ("Although [time of the essence] language does not appear in the contract here, the contract does express that the defendants might treat the agreement as broken by the plaintiff if the plaintiff was unable to convey good and marketable title within sixty days from the date of the contract . . . We view this as persuasive evidence of the parties' intention that the [buyers] were entitled to strict performance of the contract and equivalent to a recitation that time is of the essence."); see also 14 Powell on Real Property § 81.03(5) (2005).

20

Further, even if the contract does not specify that the date for performance is precise, circumstances surrounding the transaction may show that the specified time is essential. Those circumstances include statements of the parties that indicate the closing date is important. 14 Powell on Real Property § 81.03(5) (2005); see Colbath v. H.B. Stebbins Lumber Co., 144 A. 1, 3 (Me. 1929) ("[U]nder some circumstances, in law time may or not be of the essence according to the intent of the parties."); see also Baybutt Constr. Corp. v. Commercial Union Ins. Co., 455 A.2d 914, 919 (Me. 1983) ("[T]he paramount principle in the construction of contracts is to give effect to the intention of the parties as gathered from the language of the agreement viewed in the light of all the circumstances under which it was made.").

Finally, even if the parties intended more flexibility in deadlines, "a rule of reasonableness is appropriate." 14 Powell on Real Property § 81.03(5) (2005); see Me. Mut. Fire Ins. Co. v. Watson, 532 A.2d 686, 689 (Me. 1987) ("When no time for performance is specified in the contract, a 'reasonable time' is implied."); see also Seile v. Adams, 2002 Me. Super. LEXIS 247, at *3-4 (Dec. 18, 2002) (generally, time is not considered of the essence in contract for conveyance of real estate; attorney's statements that closing date was flexible indicated that time was not of the essence and a reasonable time applied). Defendant was correct when she testified that the true issue in this case was the down payment. Although she stated she needed more time to deal with Owen Pickus, whether and when he might have agreed a second time to help her is unknown on this record.

The defendant's failure to close the transaction on June 28, 2012 was a breach of the parties' Agreement. (Jt. Ex. 1 ¶ 16.) Plaintiffs are entitled to retain the earnest money.

21

## 2. Negligent Misrepresentation

Plaintiffs argue defendant failed to inform them that she applied for financing on terms different from those in the Agreement, failed to inform them she was having issues obtaining a loan because of the need for a divorce decree, and was untruthful in stating the delay was because of the lender's inability to process loan applications in a timely way. In order to prevail on the negligent misrepresentation claim, plaintiffs must prove that defendant (1) in a transaction in which defendant had a pecuniary interest (2) supplied false information for the guidance of plaintiffs (3) without exercising reasonable care or competence and (4) plaintiffs justifiably relied on that false information and sustained pecuniary loss. See Binette v. Dyer Library Ass'n, 688 A.2d 898, 903 (Me. 1996).

The issue in this case is not the type of financing defendant applied for. If, for example, defendant had received the promised help from her husband for the 30% down payment, the transaction could have closed but for Wells Fargo's last minute requirement of a divorce decree. See, e.g., Ross v. Eichman, 529 A.2d 941, 943 (N.H. 1987) ("[I]t made no difference to the seller where the financing came from."); Loda v. H.K. Sargeant & Assocs., 448 A.2d 812, 817 (Conn. 1982) (realtor and sellers had "no ascertainable interest in the actual terms obtained" by buyers); Renouf v. Martini, 577 S.W.2d 803, 804 (Tex. Civ. App. 1979) (financing provision benefits buyer and is not a condition precedent to closing; provision cannot be used by seller for his own benefit if buyer can perform); Leavitt v. Fowler, 391 A.2d 876, 878 (N.H. 1978) ("[I]t made no difference to [sellers] where the money came from."). The issue is whether she was able to obtain financing and close the transaction. See Ross, 529 A.2d at 943. Wells Fargo never told defendant it was unwilling or unable to provide financing.

22

Defendant had no personal obligation to inform plaintiffs about her application to Wells Fargo. Further, on this record, she was not involved in the letter sent to plaintiffs from Wells Fargo. (Pls.' Ex. 3.) The Agreement provided that Wells Fargo was authorized to communicate with plaintiffs and Ms. Whitney. (Jt. Ex. 1 ¶ 14(c).) No inquiry or communication from them occurred. Although Mr. Fishman did not create an addendum with regard to the financing applied for, Ms. Whitney did not send the Agreement to the lender, as Ms. Maynard stated is the preferred practice.

### 2. Damages

Plaintiffs have failed generally to mitigate their damages.[2] See Schiavi Mobile Homes, Inc. v. Gironda, 463 A.2d 722, 725 (Me. 1983); 14 Powell on Real Property § 81.04(2)(c) (2005). After the transaction with defendant did not close in June 2012 and after the Wilmont agreement did not proceed, plaintiffs did not relist the property until April 2013 for $1,100,000.00, a price plaintiffs' broker could not support. The price was reduced three times to $899,000.00 and sold in January 2014 for $850,000.00. Plaintiffs made no effort to rent the property, even though they agree an empty house is a red flag for potential buyers. Instead, they allowed their son to live there for a time.

Plaintiffs did attempt to mitigate their damages when they signed the Purchase and Sale Agreement with Ms. Wilmont. That agreement is an important factor in the damage assessment. The June 28, 2012 closing with defendant did not take place. Plaintiffs signed a Purchase and Sale Agreement with Ms. Wilmont effective July 30, 2012. Although that sale did not proceed and Ms. Wilmont was released from the

---

[2] Defendant did not plead mitigation of damages as an affirmative defense. (Def.'s Ans.) Defendant raised the issue of mitigation during the testimony of Mr. Lukas at trial. The court will consider this defense. M.R. Civ. P. 15(b).

23

agreement, [*] it remains unexplained why defendant's liability should then be resurrected. On this record, defendant had no involvement in the unraveling of plaintiffs' agreement with Ms. Wilmont.

Finally, plaintiffs request attorney's fees based on defendant's conduct. Defendant did nothing that rises to the level required for an award of attorney's fees. See Baker v. Manter, 2001 ME 26, ¶ 13, 765 A.2d 583. The court found defendant credible and does not conclude that she acted in bad faith or that she intentionally misrepresented material information to plaintiffs. (Pls.' Mem. 19.)

The issue of whether she worked full time is unclear. She testified at her deposition that she took time off after her children were born. (Jt. Ex. 6 89-90.) She informed Mr. Murdoch that she worked full time for the past nineteen years. (Pls.' Ex. 6.) She testified at trial that she took time off for her children but always worked full time.

With regard to the financing, defendant did not testify at her deposition that she applied for 70-30 financing. (Jt. Ex. 6 27-28.) Although the question of whether she applied for 70% financing was asked, another question was immediately asked about a 30% down payment, which defendant answered. She intended to pay a 30% down payment with the help of her husband from marital assets.

B. Defendant's Counterclaim

1. Breach of Contract

Defendant alleges plaintiffs breached the Agreement by failing to return the earnest money to defendant. Defendant's failure to close the transaction constituted a default of the parties' Agreement. Pursuant to that Agreement, defendant is not

---

[*] The events surrounding the failure of the plaintiffs-Wilmont Purchase and Sale Agreement or the reason for not relisting the property again until April 2013 are not explained on this record.

24

entitled to a return of the earnest money. (Jt. Ex. 1 ¶ 16); see 14 Powell on Real Property § 81.03(5) (2005) ("[T]he delinquent party loses any right to enforce the contract.").

The entry is

> Judgment is entered in favor of Plaintiffs Suzanne Lukas and Mark Lukas and against Defendant Geraldine Ollila-Pickus, M.D. on Counts I and II of Plaintiffs' Complaint in the amount of $40,000.00, plus prejudgment interest at the rate of 3.16% and post-judgment interest at the rate of 6.27%, plus costs.
>
> Judgment is entered in favor of Defendant Geraldine Ollila-Pickus, M.D. and against Plaintiffs Suzanne Lukas and Mark Lukas on Count III of Plaintiffs' Complaint.
>
> Judgment is entered in favor of Plaintiffs Suzanne Lukas and Mark Lukas and against Defendant Geraldine Ollila-Pickus, M.D. on Defendant's Counterclaim.

Date: December 23, 2015

_____
Nancy Mills
Justice, Superior Court

YORK-CV-13-010

25

CUMBERLAND COUNTY SUPERIOR COURT
PO BOX 412
PORTLAND ME 04112

ADAM TAYLOR ESQ
ILSE TEETERS TRUMPY ESQ
TAYLOR MCCORMACK & FRAME
30 MILK ST
5TH FLOOR
PORTLAND ME 04101

ROBERT WEAVER ESQ
THEODORE IRWIN JR
WILLIAM VICKERSON ESQ
IRWIN TARDY & MORRIS
PO BOX 7030
PORTLAND ME 04112-7030